UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

Waterbury Hospital, Cason, Inc., and Frankie's
Franchise Systems Inc., on behalf of themselves and   :
others similarly situated,

                  :     Civil Action No. 3:06-CV-
          Plaintiffs,     :     01657 (CFD)

                  :
      vs.              :

U.S. Foodservice, Inc.,             :

         Defendants.    :
                            December 29, 2006
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## U.S. FOODSERVICE, INC.'S MOTION TO STAY
## DISCOVERY PENDING ITS MOTION TO DISMISS

      Defendant U.S. Foodservice, Inc. ("USF") submits this memorandum of law in support of

its motion to stay discovery pending the disposition of its forthcoming motion to dismiss the

putative class action Amended Complaint ("Complaint" or "Compl.") of Plaintiffs Waterbury

Hospital ("Waterbury"), Cason, Inc. ("Cason"), and Frankie's Franchise Systems, Inc.

("Frankie's").  USF further requests, that once discovery commences, this Court limit the scope

of discovery to issues concerning class certification or to the claims of the named Plaintiffs until

Plaintiffs' motion to certify a class is resolved.

## PRELIMINARY STATEMENT

      In order to avoid the great expense and enormous burden of providing massive discovery

to Plaintiffs before they have sustained a complaint, USF, the second largest food distributor in

the United States, requests that the Court exercise its discretion to stay discovery pending the outcome of USF's motion to dismiss, to be filed in five weeks.

Relying on the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which has been described as "the most misused statute in the federal corpus of law," Plaintiffs have filed a putative federal class action on behalf of a nationwide class consisting of USF's customers who had so-called "cost-plus" contracts. The Complaint, however, fails to state a claim. Apparently, Plaintiffs seek either to "discover" their way into a viable complaint or obtain an early settlement based on USF's perceived burdens and risks. USF's motion to dismiss will likely resolve some or all of the claims.

The discovery Plaintiffs seek will be monumental. Plaintiffs have alleged that USF has some 300,000 customers and revenue approaching $18 billion annually. They have indicated that they will seek, inter alia, information concerning "USF's . . . invoices sent to customers who purchase products on a cost-plus basis," likely to include many millions of pages. Additionally, Plaintiffs have indicated that they will seek discovery of "USF's accounting practices" and concerning "governmental, regulatory, or internal investigation or inquiry of USF or Royal Ahold [USF's parent] regarding USF's billing and/or accounting practices." Such document categories are overly broad and sweep into their ambit tens of millions of pages, including unrelated matters and productions in multiple domestic and foreign governmental investigations and in a massive multi-district litigation (now resolved) having nothing to do with the allegations in this case.

Plaintiffs will not be prejudiced by a few month delay in the commencement of discovery in the event their Complaint survives a motion to dismiss. Under similar circumstances, courts routinely grant stays of discovery.

Additionally, once discovery commences, Plaintiffs should not be permitted to immediately obtain nationwide discovery. Because the issues in the Complaint raise numerous individualized issues, including each plaintiffs' knowledge and the effect of differing contract terms interpreted under the laws of different states, class certification is not proper. Thus, it is appropriate to limit discovery, if and when it commences, to issues necessary for Plaintiffs to seek, and USF to oppose, class certification.

## PROCEDURAL BACKGROUND

On October 19, 2006, Plaintiffs filed a class action complaint alleging violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c), and breach of contract against USF. USF notified Plaintiffs of its intention to file a motion to dismiss, and counsel for Plaintiffs and USF agreed to a briefing schedule where USF would file its motion to dismiss on January 10, 2007, with opposition papers due February 9, 2007 and reply papers due March 9, 2007. On November 22, 2006, the Court so ordered the schedule.

On December 18, 2006, Plaintiffs filed an Amended Class Action Complaint. The Complaint added Frankie's as a new Plaintiff, and included additional allegations concerning the alleged RICO enterprise scheme. (Compl. ¶¶ 12, 42-57) As a result of the amendment, the parties agreed that USF would file its motion to dismiss on February 2, 2007, Plaintiffs would file their opposition papers on March 5, 2007 and USF would file its reply papers on April 4, 2007.

During telephonic conferences between the parties to negotiate a case management plan, USF raised with Plaintiffs the option of staying discovery and/or limiting discovery to issues of class certification prior to the determination of Plaintiffs' motion for class certification. Plaintiffs have not agreed to so limit discovery. (See Report of Parties' Planning Meeting at 13-

17.) USF informed Plaintiffs that it would move for a stay of discovery. (See Baumstein Decl. ¶ 4)

## FACTUAL BACKGROUND

The Complaint asserts claims for a RICO violation and breach of contract against USF. (Compl. ¶¶ 83-94) Plaintiffs' claims are each based on Plaintiffs' misstatement that USF was obligated to calculate prices for Cason, Waterbury and Frankie's under so-called "cost-plus contracts" using USF's and its vendors' "actual cost." (Compl. ¶¶ 3, 18, 23-25) Cason is not party to any form of cost-plus contract (Compl. ¶ 11), but rather purchases off of price lists, which have no cost-plus component of any kind. Hence, Cason is not a proper Plaintiff.

Waterbury purchases under a contract between USF and a group purchasing organization, Novation, LLC ("Novation"). (Pryor Decl. Exs. 1 and 2) Notably, Novation does not assert any breach of the contract it negotiated and executed. (Compl. ¶¶ 10-14) Dispositively, the Novation contract does not provide for pricing based on "actual cost" plus a mark-up, as Plaintiffs misstate (Compl. ¶¶ 22-25), but rather based on USF's "Landed Cost," also known as "invoice cost," plus a mark-up -- precisely what USF charged. (Pryor Decl. Ex. 1, at Attach. H, Ex. AA, ¶ G.1) "Landed Cost" is defined in terms of the invoice price from the manufacturer, supplier, packer or any other vendor, not the actual cost. (Id.) Although, Plaintiffs do not allege the terms of Frankie's contract, Plaintiffs' allegation of a "typical" contract similarly shows that "invoice cost," not "actual cost," was to be used in the calculation of the price to customers. (Compl. ¶ 23) In all cases, USF paid the invoice costs in full and then computed prices to "cost-plus" customers based on such invoice cost and Plaintiffs do not allege otherwise.

Plaintiffs allege that USF entered into a scheme with certain value added service providers ("VASPs"), and "other USF suppliers" from whom USF purchased foodservice

products, to inflate the cost component under "cost-plus" contracts. (Compl. ¶¶ 31-34, 59)  USF

is alleged to have secretly directed the VASPs and other suppliers to purchase specific

foodservice products and mark-up the invoices for these products by specific amounts (Compl.

¶¶ 32, 34), and then "kick-back" to USF any amounts above the actual cost of the particular

goods.  (Compl. ¶¶ 33, 35, 37-39, 41)  What Plaintiffs describe as a "kickback" is merely a

rebate from suppliers, commonly referred to as a "promotional allowance."  Promotional

allowances are absolutely standard in the food distribution industry, and in numerous other

industries.  Indeed, essentially every supplier provides some form of promotional allowance to

food distributors like USF.  The promotional allowances were provided to benefit USF for its

substantial purchases and efforts and expense to market the supplier's products, and USF was not

required to pass on such promotional allowances.  The more burden USF assumed in connection

with the myriad of costs and activities required for the sourcing, manufacturing, marketing and

distribution of product, the greater was USF's opportunity to earn promotional allowances.

Thus, contrary to Plaintiffs' unsupported allegation, USF was expressly permitted to retain

promotional allowances from suppliers and the VASPs:  "Participating Members shall in no

event be entitled to promotional allowances, cash discounts, prompt pay discounts, growth

programs or any other supplier incentives received by [USF]."  (Pryor Decl. Ex. 1, at Attach. H,

Ex. AA, ¶ G.1) (defining "Landed Costs").  As Plaintiffs recognize, USF's "invoices" typically

stated that USF's "product costs" did not reflect adjustments for "promotional allowances" and

other "discounts" and "incentives."  (RICO Case Statement at 8)

     Plaintiffs ignore not only the contract at issue, but also the industry standard that the cost

component of a "cost-plus contract" is based on "invoice cost" or "Landed Cost," not "actual

cost," as alleged by Plaintiffs (in contradiction to the terms of the contract at issue).  Most food

distributors operate under substantially similar arrangements. Thus, the invoice cost-plus arrangements generally were well known to customers. Indeed, USF's arrangements with the VASPs were disclosed in the annual reports and Form 20-Fs filed by USF's parent, Royal Ahold, on October 23, 2003 and May 6, 2004. (Pryor Decl. Exs. 3-6) For example, the 2002 20-F states:

> Each VASP, at the request of or with the consent of USF, will purchase certain commodities and products from third parties, then mark-up and resell such products to USF. Although these VASPs are not owned by USF, they are almost entirely dependent on their sales to USF. The VASPs provide varying degrees of support to USF primarily in the purchase of private label and signature brand products. USF engages in direct business discussions with the VASPs' ultimate vendors to ensure price, product specification and quality requirements are met and to take advantage of volume purchasing power. . . . A portion of the VASPs' sales price to USF is subsequently passed back to USF, leaving the VASPs with a predetermined, per transaction fee. The transaction fee, which includes reimbursements for holding costs associated with the inventory are intended to be sufficient to allow the VASPs to recover substantially all of its operating costs with a limited profit. USF uses the invoice price from the VASPs as its cost in sales made to its customers under "cost plus" contracts.

(Pryor Decl. Ex. 5).

USF's use of invoice costs in pricing benefits customers in allowing them to compare prices for competing products. Products generally fall within three categories: national brands, exclusive label brands and "packer label" (generic) brands. The price for national brands, as reflected on the invoice, covers the cost of the product, including research and development, sourcing, marketing, logistics, quality control, brand development, inventory positioning and other matters, as well as profit. USF paid those invoices and then computed prices to cost-plus customers based on such invoice cost. Plaintiffs do not appear to assert any claim on the basis of national brand invoice costs.[1]

---

[1] To the extent that Plaintiffs extend their broad allegations of fraud to include all of the unrelated third party manufacturers of food products in the United States, the allegations are conclusory, incorrect and incredible.

Like the national brands, USF's exclusive label brands and packer label products have all or some of the same types of costs for research and development, sourcing, marketing, logistics, quality control, brand development, inventory positioning and other matters. Those services were provided by a combination of USF, the VASPs and other suppliers. The VASPs and other suppliers, just like the national brands, issued invoices to USF charging for those items. And, as they did with respect to national brands, USF paid, and then based its pricing on, such invoices. Such symmetry in invoicing allowed customers to compare intelligently the price of products, as between national and private brands, each reflecting the all-in cost without need for the customer to perform differing computations for each of the numerous products. Plaintiffs simply cannot support their unwitting premise that national brands could charge for research and development, sourcing, marketing, logistics, quality control, brand development, inventory positioning and other costs, but exclusive label brands and packer label products could not so charge. For all relevant purposes, exclusive label brands and packer label products operated their businesses, and charged for their products, in the same fashion as did national brands, and there was absolutely nothing improper about that basic business fact.

In any event, customers, like Plaintiffs, do not purchase product based on the mere supposition that a contract formula assures them of competitive pricing. USF and other food distributors issue monthly and weekly lists of products showing the items available and the price under the relevant contracts. Customers review the various lists and place orders with full awareness of the price of the products. The contracts are not exclusive, and customers may purchase at least some of their product from the source offering the lowest price. Thus, customers purchasing from USF generally receive the lowest available price, irrespective of computation.

# ARGUMENT

## I.

## DISCOVERY SHOULD BE STAYED PENDING USF'S MOTION TO DISMISS

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, "the court 'has the discretion to stay discovery for good cause, and [that] good cause may be shown where a party has filed (or sought leave to file) a dispositive motion.'" Cuartero v. United States, No. 3:05CV1161, 2006 WL 3190521, at *1 (D. Conn. Nov. 1, 2006) (quoting Anti-Monopoly, Inc. v. Hasbro, Inc., No. 94 Civ. 2120, 1996 WL 101277, at *2 (S.D.N.Y. Mar. 7, 1996)); Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 201 F.R.D. 1, 2 (D.D.C. 2001) ("[i]t is settled that entry of an order staying discovery pending determination of dispositive motions is an appropriate exercise of the court's discretion"). In determining good cause, courts have looked to three factors: (i) the strength of the dispositive motion; (ii) the breadth of the discovery sought and the burden of responding to it; and (iii) the prejudice that would be suffered by the party opposing the stay. Cuartero, 2006 WL 3190521, at *1; Chesney v. Valley Stream Union Free Sch. Dist. No. 24, 236 F.R.D. 113, 115 (E.D.N.Y. 2006).

The exercise of the court's discretion to limit or stay discovery is particularly appropriate with respect to alleged RICO violations:

> The need to reasonably limit the scope of discovery is acute for claims brought under the RICO statute. The Supreme Court has recognized that the breadth of the RICO language encourages attempts to turn business disputes into federal racketeering charges. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Thus, the risk that a party will attempt to use discovery to conduct a "fishing expedition" is a significant concern. See Sutliff, Inc. v. Donovan Cos., 727 F.2d 648, 652 (7th Cir. 1984) (Judge Posner described the RICO statute as "constructed on the model of a treasure hunt.") See also Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674 (6th Cir. 1988) (court recognized the dilemma of the trial judge who has to

distinguish between strike suits and RICO claims that bear credibility).

PMC, Inc. v. Ferro Corp., 131 F.R.D. 184, 187 (C.D. Cal. 1990).

The pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure likewise support carefully structured discovery in a case like this one. "The purpose of Rule 9(b) is threefold-it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (citing Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990)); Stern v. Leucadia Nat'l. Corp., 844 F.2d 997, 1003 (2d Cir. 1988); DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)). Plaintiffs cannot seek discovery to cure pleading deficiencies. See Abrahams v. Young & Rubicam, 979 F. Supp. 122, 129 (D. Conn. 1997) ("[t]he 'purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists'") (citation omitted); Decatur Ventures, LLC v. Stapleton Ventures, LLC, 373 F.Supp. 2d 829, 843 (S.D. Ind. 2005) ("[t]he purpose of discovery is to distill the issues in a case for trial, not to gather information to support a complaint") (citing Fred A. Smith Lumber Co. v. Edidin, 845 F.2d 750, 754 (7th Cir. 1988) (holding that plaintiff acted in bad faith by filing a complaint alleging RICO violations "in the hope that future discovery might uncover the allegations of wrongdoing") (citation omitted)); Avnet, Inc. v. Am. Motorists Ins. Co., 115 F.R.D. 588, 592 (S.D.N.Y. 1987) ("[t]he discovery rules are not a hunting license to conjure up a claim that does not exist") (citing Samuels v. Eleonora Beheer, B.V., 500 F.Supp. 1357, 1362 (S.D.N.Y. 1980)). Thus, a defendant "has the right ... to challenge the legal sufficiency of the complaint's allegations against him, without first subjecting himself to discovery procedures." Jones v. Capital Cities/ABC Inc., 168 F.R.D. 477, 480 (S.D.N.Y. 1996)

(omission in original); <u>Greene</u> v. <u>Emersons, Ltd.</u>, 86 F.R.D. 66, 73 (S.D.N.Y. 1980) (stating same).

A.    **USF's Motion To Dismiss Raises**
      **Substantial Issues And May Resolve The Action**

The Court need not determine at this time that USF's motion to dismiss will succeed, but only that such motion will "raise substantial issues based on statutes, caselaw and the facts of this case," to find good cause for a stay of discovery.  See <u>Cuartero</u>, 2006 WL 3190521, at *2; <u>see</u> <u>also</u> <u>Chrysler Capital Corp.</u> v. <u>Century Power Corp.</u>, 137 F.R.D. 209, 210 (S.D.N.Y. 1991) (finding that a motion to dismiss based on a failure to state a claim and failure to plead fraud with particularity is sufficiently founded in law to warrant a stay of discovery).  As demonstrated below, there is substantial basis to dismiss all claims against USF.  Consequently, the Court's determination of USF's motion to dismiss "may significantly narrow, if not eliminate, the issues remaining in the case."  <u>Rivera</u> v. <u>Heyman</u>, No. 96 Civ. 4489, 1997 WL 86394, at *1 (S.D.N.Y. Feb. 27, 1997).

In light of such considerations, numerous courts in this Circuit have found that it is inappropriate and unfair to subject defendants to costly, time-consuming, and burdensome discovery where there is a fair chance that the action will be dismissed.  See, e.g., <u>Cuartero</u>, 2006 WL 3190521, at * 3 (staying discovery pending determination of motion to dismiss, noting that "[p]ermitting discovery to proceed at this point would be unduly burdensome to the defendant and would be inefficient for both parties, since the court's decision on the Motion to Dismiss may significantly narrow the issues"); <u>In re First Constitution S'holders Litig.</u>, 145 F.R.D. 291, 294 (D. Conn. 1991) (granting stay of discovery because the discovery "burden placed upon defendants will be enormous" and it was likely that "discovery will be protracted"); <u>Spencer Trask Software & Info. Servs., LLC</u> v. <u>RPost Int'l Ltd.</u>, 206 F.R.D. 367, 368 (S.D.N.Y. 2002)

(staying discovery where defendants "appear to have substantial arguments for dismissal of many, if not all, of the claims asserted in this lawsuit"); Johnson v. N.Y. Univ. School of Educ., 205 F.R.D. 433, 434 (S.D.N.Y. 2002) (staying discovery pending decision on motion to dismiss that might "obviate the need for burdensome discovery"); United States v. County of Nassau, 188 F.R.D. 187, 189 (E.D.N.Y. 1999) (staying discovery pending decision of defendant's motion to dismiss); Rivera, 1997 WL 86394, at *2 (granting stay of discovery pending disposition of defendants' forthcoming motion to dismiss); Am. Booksellers Ass'n, Inc. v. Houghton Mifflin Co., No. 95 Civ. 8566, 1995 WL 72376, at *1 (S.D.N.Y. Feb. 22, 1995) (granting motion to stay discovery pending decision on a motion to dismiss which could dispose of the entire action); Gandler v. Nazarov, No. 94 Civ. 2272, 1994 WL 702004, at *4 (S.D.N.Y. Dec. 14, 1994) (granting motion to stay all discovery pending resolution of a defendant's motion to dismiss in order to "avoid the need for costly and time-consuming discovery" ); Chrysler, 137 F.R.D. at 211 (granting motion to stay discovery until motions to dismiss are decided, finding that "[t]he discovery requests are extensive and defendants' motions for dismissal do appear to have substantial grounds"); Eisenberg v. Yes Clothing Co., No. 90 Civ. 8280, 1991 WL 89639, at *1 (S.D.N.Y. May 21, 1991) (granting motion to stay discovery pending court's determination of a motion to dismiss, finding that "continuation of the discovery in this case would involve the court in a time consuming resolution of numerous exchanges and disputes between the parties– an exercise that may be mooted or reduced by a total or partial resolution of the case on motion"); see also Weisman v. Mediq, Inc., No. 95-1831, 1995 WL 273678, at *2 (E.D. Pa. May 3, 1995) ("Where a pending motion to dismiss may dispose of the entire action. . . the balance generally favors granting a motion to stay").  The Second Circuit has approved the issuance of

such orders.  See Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 130 (2d Cir. 1987) (affirming protective order preventing discovery prior to a decision on a motion to dismiss).

<strong>1.      There Are Substantial Legal Issues That<br>Plaintiffs Fail To State A Claim For Civil RICO</strong>

As will be demonstrated in USF's motion to dismiss, Plaintiff's Complaint should not survive a motion to dismiss.  "[T]he civil provisions of [RICO] are the most misused statutes in the federal corpus of law."  Spoto v. Herkimer County Trust, No. 99-CV-1476, 2000 WL 533293, at *1 (N.D.N.Y. Apr. 27, 2000).  "'Civil RICO is an unusually potent weapon–the litigation equivalent of a thermonuclear device.'  Because the 'mere assertion of a RICO claim … has an almost inevitable stigmatizing effect on those named as defendants, … courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'"  Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 2d Cir. 1997) (internal citations omitted).

As one court has noted, "every member of the federal bench has before him or her at least one–and possibly more–garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages. . . ."  Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000).  Thus, "'courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'"  Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 537 (S.D.N.Y. 2001) (quoting Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)); see also Mathon v. Marine Midland Bank, N.A., 875 F. Supp. 986, 1001 (E.D.N.Y. 1995) ("[A]ctions traditionally brought in state courts [should] not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations") (citations omitted).

To sustain a RICO claim predicated on mail or wire fraud, as alleged here, a plaintiff "must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted). Plaintiffs must allege each such element with particularity under Rule 9(b). See, e.g., Daddona v. Gaudio, 156 F. Supp. 2d 153, 161 (D. Conn. 2000) (Fed. R. Civ. P. 9(b) applies to RICO predicate act allegations of mail and wire fraud); Gruber v. Prudential-Bache Sec., Inc., 679 F. Supp. 165, 171 (D. Conn. 1987) (same). Thus, "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993) (citation omitted). "'[L]oose references to mailings and telephone calls' in furtherance of a purported scheme to defraud will not do." Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994) (citing R.E. Davis Chem. Corp. v. Nalco Chem. Co., 757 F. Supp. 1499, 1516 (N.D. Ill. 1990)). Likewise, "circumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter." Stern, 844 F.2d at 1004 (citation omitted).

Plaintiffs' allegations of mail and wire fraud do not satisfy the particularity requirement as they fail to allege "who was involved [in the communication], where and when they took place, and. . .why they were fraudulent." Mills, 12 F.3d at 1176 (citation omitted). Neither the Complaint nor Plaintiffs' RICO Case Statement identify any single mailing or telephone call as being fraudulent. Nor do Plaintiffs identify any particular arrangement with a VASP or other supplier as being improper. Plaintiffs have also failed to adequately allege scienter. Plaintiffs' allegation is that USF concealed the fact that the VASPs used invoice cost, as opposed to "actual

cost," for cost-plus pricing. Both Ahold's 2002 and 2003 annual report and its form 20-F filed with the SEC, however, disclosed the allegedly concealed arrangements with the VASPs. (Pryor Decl. Exs. 3-6) For example, the 2002 20-F states:

> Each VASP, at the request of or with the consent of USF, will purchase certain commodities and products from third parties, then mark-up and resell such products to USF. Although these VASPs are not owned by USF, they are almost entirely dependent on their sales to USF. The VASPs provide varying degrees of support to USF primarily in the purchase of private label and signature brand products. USF engages in direct business discussions with the VASPs' ultimate vendors to ensure price, product specification and quality requirements are met and to take advantage of volume purchasing power. . . . A portion of the VASPs' sales price to USF is subsequently passed back to USF, leaving the VASPs with a predetermined, per transaction fee. The transaction fee, which includes reimbursements for holding costs associated with the inventory are intended to be sufficient to allow the VASPs to recover substantially all of its operating costs with a limited profit. USF uses the invoice price from the VASPs as its cost in sales made to its customers under "cost plus" contracts.

(Pryor Decl. Ex. 5).

Additionally, "the customary commercial practice" in the foodservice industry is "that discounts and rebates are considered distinct from compensation earned by distributors for performing actual services for suppliers and that such compensation generally is not passed on to customers in the form of discounts or rebates." In re Lankford-Sysco Food Servs., Inc., 1997 WL 3244, at *3, 97-1 C.P.D. ¶ 11 at 2 (Comp. Gen. Jan. 6, 1997) (holding that where contract language was similar to that cited by Plaintiffs, consistent with the customary commercial practice, "no provision in the [contract to be executed] could reasonably be interpreted as requiring such 'earned income' to be passed through to the government.") The Government Accounting Office also has found that retaining promotional allowances and including earned income in invoice prices is also standard industry practice even in sales between affiliated entities or business units within an organization:

> Smelkinson [the foodservice company] contends that the requirements for disclosure of profit and freight costs in excess of actual costs related to interorganizational transfers among affiliates are contrary to customary practice in the food distribution industry.
>
> Smelkinson asserts that <u>it is customary in the food service industry for large food distributors</u>, or consortiums of smaller food service companies, <u>to operate through a central purchasing and distribution center that can purchase from suppliers at high volume, resulting in lower prices that may be passed to</u> consortium members or <u>affiliates</u>. Smelkinson explains that <u>certain mark-ups may then be added to these prices, for instance, in light of numerous "value-added services" performed by the central purchasing and distribution center for its members</u>. . . . Smelkinson further states that where the distributor, or central purchasing and distribution center, operates its own transportation network, customary commercial practice is for transportation of the item transferred to be charged at price, rather than cost, which may include profit or other elements.

<u>In re Smelkinson Sysco Food Servs.</u>, 1999 WL 140173, at *2, 99-1 C.P.D. ¶ 57 at 2 (Comp. Gen. Mar. 15, 1999) (holding that customary food industry practice as described by Smelkinson required alteration of government agency's request for proposal) (emphasis added). Thus, Plaintiffs do not allege that such standard practices were unknown to Frankie's or Novation, the general purchasing organization which negotiated the contract pursuant to which Waterbury purchases products, or to the marketplace as a whole, or were concealed.

**2.  There Are Substantial Legal Issues That
<u>Plaintiffs Fail To State A Claim For Breach Of Contract</u>**

Plaintiffs' breach of contract claim, over which this Court has only supplemental jurisdiction, is also defective. There is no allegation that Cason is a party to a contract providing for any form of cost-plus pricing. (<u>Compare</u> Compl. ¶ 10 "Waterbury Hospital is a party to a cost-plus buying agreement. . . ." <u>with</u> Compl. ¶ 11 "Cason has purchased products on a 'cost-plus' basis from USF") USF's records indicate that Cason is not party to any contract and purchased off of pricing lists, which have no cost-plus component.

The party that negotiated and executed the contract under which Waterbury Hospital purchased product, Novation, does not assert any breach here. Plaintiffs' claim is based on the misstatement of the Novation contract. Under the Novation contract, USF was required to calculate Waterbury's prices based on the "Landed Cost." (Pryor Decl. Ex. 1, Attach. H, Ex. AA, ¶ G.1) ("The price for Participating Members sold under this Agreement (the 'Price') will be calculated on the basis of Landed Cost.") Plaintiffs do not dispute that USF so charged Waterbury Hospital. In asserting a breach, Plaintiffs simply misstate the terms of the Novation contract as providing for pricing based on "actual costs." (Compl. ¶¶ 22-25) The contract contains no such term.

The term used in the Novation contract, "Landed Cost," is defined in relevant part as:

a. (in the case of Contract Products) the amount provided in the applicable Supplier Agreement as the National or Regional contract price to be billed to Members without the subtraction for cash discounts allowed by Suppliers for prompt payment and prior to the addition of the cost plus mark-up.

b. (in the case of Non-contract Product) the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to Approved Distributor's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice discounts to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice.)[2]

(Pryor Decl. Ex. 1, at Attach. H, Ex. AA, ¶ G.1) Landed Cost, in effect, is invoice cost (possibly adjusted to add a freight charge if the invoice does not include delivery). Promotional allowances and other incentives received from the VASPs and other suppliers are expressly

---

[2] "Contract Products" are defined as those listed in Exhibit B to the contract (Pryor Decl. Ex. 1, at 1.b), which are primarily recognized national brands, "Noncontract Products" are defined as "all other products which may be distributed to Participating Members."  (Id.)

excluded from the calculation of Landed Costs.  "Participating Members shall in no event be entitled to promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by [USF]."  (Id. at ¶ G.2)  Plaintiffs bald statement that the promotional allowances received from VASPs "did not constitute legitimate 'promotional allowances' or any other sort of bona fide incentive that USF sometimes received from its suppliers" is unsupported and incorrect.  (Compl. ¶ 35)

Similarly, the alleged "typical" cost plus contract (Compl. ¶ 23), to which Frankie's is not alleged to be a party, is explicit that "invoice cost," not "actual cost," is to be used for calculating the prices under cost-plus contracts.  Moreover, as with the Novation contract, the alleged contract is explicit that "[i]nvoice cost shall not be adjusted for, and Customer shall not be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by USF."  (Compl. ¶ 23)

USF's use of invoice costs in pricing benefits customers in allowing them to compare prices for competing products.  Products generally fall within three categories: national brands, exclusive label brands and "packer label" (generic) brands.  Plaintiffs do not appear to assert any claim on the basis of national brand invoice costs.

The price for national brands, as reflected on the invoice, covers the cost of the product, including research and development, sourcing, marketing, logistics, quality control, brand development, inventory positioning and other matters, as well as profit.  Like the national brands, USF's exclusive label brands and packer label products have all or some of the same types of costs.  Those services were provided by a combination of USF, the VASPs and other suppliers.  The VASPs and other suppliers, just like the national brands, issued invoices to USF charging

for those items.  And, as they did with respect to national brands, USF paid, and then based its pricing on, such invoices.

The symmetry in invoicing among national brand, exclusive brand and packer label products permitted customers to compare prices easily between national and private brands, without requiring that the competing brands be subject to differing computations for numerous comparable products.  Plaintiffs unwittingly assert that only national brands -- but not exclusive label and packer label products -- may charge for research and development, sourcing, marketing, logistics, quality control, brand development, inventory positioning and other costs. Plaintiffs' supposition is entirely without basis.  For all relevant purposes, exclusive label brands and packer label products operated their businesses, and charged for their products, in the same fashion as did national brands, and there was absolutely nothing improper about that basic business fact.

In any event, customers, like Plaintiffs, do not purchase product based on the mere supposition that a contract formula assures them of competitive pricing.  USF and other food distributors issue monthly and weekly lists of products showing the items available and the price under the relevant contracts.  Customers review the various lists and place orders with full awareness of the price of the products.  The contracts are not exclusive, and customers may purchase at least some of their product from the source offering the lowest price.  Thus, customers purchasing from USF generally receive the lowest available price, irrespective of computation.

**B.  The Discovery Sought In This Class Action Case Is Overbroad And Unduly Burdensome**

In determining whether a stay is appropriate, courts also look at "the breadth of discovery sought and the burden of responding to it."  <u>Spencer Trask Software</u>, 206 F.R.D. at 368 (citation

omitted) Staying discovery when a dispositive motion is pending allows parties to avoid unnecessary discovery and promotes an efficient allocation of resources. See Cuartero, 2006 WL 3190521, at *3 (finding that allowing discovery to proceed when a motion to dismiss is pending "would be unduly burdensome to the defendant and would be inefficient for both parties, since the court's decision on the Motion to Dismiss may significantly narrow the issues"); see also Chesney, 236 F.R.D. at 116 ("Even in the event that only some of the causes are dismissed … by staying discovery now it will serve to substantially reduce the economic burden of full party discovery. By waiting until a decision is reached on the pending motion, the areas of discovery may well be substantially reduced, if not eliminated, as to certain …defendants….").

Courts routinely find that if the breadth of discovery sought would unfairly burden the party responding to the request, staying the discovery until disposition of a motion to dismiss is proper. See In re First Constitution, 145 F.R.D. at 294 (noting, in granting stay, that Plaintiff was seeking extensive discovery); Am. Booksellers, 1995 WL 72376, at *1 ("The discovery sought by plaintiffs is very broad and to require defendants to respond to it at this juncture, when their motion to dismiss may be granted, would be extremely burdensome."); Johnson, 205 F.R.D. at 434 (staying discovery pending decision on motion to dismiss that might "obviate the need for burdensome discovery").

It is well recognized that the costs and burdens of discovery in a class action can be especially onerous. See Cemail v. Viking Dodge, Inc., No. 97 C 908, 1997 WL 359962 (N.D. Ill. June 17, 1997) (staying discovery pending motion to dismiss in class action suit, finding that discovery is extensive, and if motions to dismiss are granted then defendants will be spared the expense of discovery); Gionis v. Javitch, Block & Rathbone, 405 F. Supp. 2d 856, 873 (S.D.

Ohio 2005) (staying further proceedings pending outcome of an appeal, finding that costs associated with discovery of a class action were substantial); see also 7B Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1796.1 (3d ed. 2006) ("Because of the complexity of most class actions and the numbers of people involved, the management of discovery to avoid duplicative and conflicting inquiries also is particularly important. Indeed, discovery proves to be the most protracted phase of class-action litigation").

RICO cases raise even more concern:

> RICO plaintiffs now claim license for broad discovery of documents and transactions having nothing whatsoever to do with the parties and the transaction underlying the RICO claim. The specter of such pervasive and expensive discovery may well be more of a threat to a defendant than treble damages and the stigmata of being labelled a racketeer. Except for extraordinarily well-heeled defendants, many defendants looking down the wrong end of double-barrelled RICO discovery may well be forced to capitulate or settle at figures having little or nothing to do with the merits of the dispute.

PMC, 131 F.R.D. at 187.

Here, Plaintiffs allege USF has a nationwide footprint, over 300,000 customers and yearly revenues in excess of $18 billion. (Compl. ¶¶ 15-16) Although discovery requests have not yet been served, Plaintiffs intend to seek wide-ranging and unduly burdensome discovery, as they set forth in the proposed joint planning report:

> (i) information regarding USF's cost-plus arrangements with its customers; (ii) USF's relationship with the VASPs and other suppliers that provide products to USF to be resold on a cost-plus basis; (iii) information concerning amounts of money refunded or credits issued by VASPs and other suppliers to USF in connection with sales made to USF; (iv) information concerning USF's billing practices and invoices sent to customers who purchase products on a cost-plus basis; (v) information concerning communications between USF and its customers who purchase products on a cost-plus basis; (vi) information concerning USF's accounting practices; (vii) information concerning communications between

> USF and its parent, Koninklijke Ahold, N.V. (a/k/a Royal Ahold,
> N.V.) ("Royal Ahold"), regarding USF's billing and/or accounting
> practices; (viii) information concerning any governmental,
> regulatory, or internal investigation or inquiry of USF or Royal
> Ahold regarding USF's billing and/or accounting practices; and
> (ix) information concerning the amount of damages incurred by
> plaintiffs and the Class resulting from USF's alleged misconduct.

(Report of Parties' Planning Meeting at 13-14).

Compliance with such document request would result in the production of many millions of pages of documents at an enormous cost.[3] All these costs would be avoided if this Court grants USF's motion to dismiss. Even a partial dismissal would limit the scope of discovery, thus rendering useless any discovery conducted outside of the parameters determined by the Court's decision. A stay will best comport with a "just, speedy, and inexpensive determination" of the controversy under Rule 1 of the Federal Rules of Civil Procedure.

**C.      A Stay Of Discovery Will Not Prejudice Plaintiffs**

"A stay pending determination of a dispositive motion that potentially eliminates the entire action will neither substantially nor unduly delay the action, should it continue." Spencer Trask Software, 206 F.R.D. at 368 (citation and internal quotation marks omitted); see also Telesca v. Long Island Hous. P'ship, Inc., No. CV 05-5509, 2006 WL 1120636, at *2 (E.D.N.Y. Apr. 27, 2006) (granting motion to stay discovery during the pendency of motions to dismiss, finding that the plaintiff failed to demonstrate that "a stay of discovery, for the purposes of avoiding [discovery] expenses during the pendency of the motions to dismiss, would be unfairly prejudicial") (citation omitted). On the other hand, "at this point in the litigation, proceeding with discovery while the motion to dismiss is pending would unnecessarily drain the parties' resources." Spencer Trask Software, 206 F.R.D. at 368.

---

[3] The discovery topics are clearly overbroad and unduly burdensome. The topics sweep into their ambit tens of millions of pages, including unrelated matters and productions in multiple domestic and foreign governmental investigations and in a massive multi-district litigation (now resolved).

This case is still in its beginning stages, having only recently concluded a Rule 26(f) conference on case management.  A stay of discovery at this stage of the case will not prejudice the Plaintiffs' ability to later obtain discovery.  See In re First Constitution, 145 F.R.D. at 293 (stay of discovery "would be no prejudice to plaintiff, which 'will have ample time [if the motion to dismiss is denied] to take discovery on the merits of its claims'") (citation omitted); Anti-Monopoly, 1996 WL 101277, at *3 (finding that plaintiff would not be prejudiced by a stay of discovery because the court believed that the defendant's motion to dismiss would be decided before the parties' proposed discovery deadline).  The briefing schedule for the motion to dismiss agreed upon by both parties limits the duration of the anticipated stay of discovery.  See In re First Constitution, 145 F.R.D. at 294 ("[The] plaintiffs are not unduly delayed if discovery is stayed for what is expected to be a relatively short period of time.").

There is no suggestion in the Complaint or otherwise why Plaintiffs need discovery now as opposed to after this Court determines whether the case will proceed.[4]  In "[t]he interests of fairness, economy and efficiency," discovery should be stayed until USF's Motion is decided. See County of Nassau, 188 F.R.D. at 189 (staying discovery pending decision of defendant's motion to dismiss).

## II.

### ONCE DISCOVERY COMMENCES, THE COURT SHOULD RESTRICT  THE SCOPE OF DISCOVERY TO CLASS CERTIFICATION ISSUES OR MERITS DISCOVERY ON NAMED PLAINTIFFS' CLAIMS

Whether or not discovery is stayed pending a motion to dismiss, once discovery does commence, USF requests that discovery first be limited to class certification issues.  Such

---

[4] Additionally, in order to avoid any potential issues concerning the maintenance of documents, USF will preserve relevant documents pursuant to its obligations under the Federal Rules and work with Plaintiffs to identify documents it believes should be preserved.

discovery is necessarily limited, but would permit plaintiffs to file a motion for class certification early in the case, if the Complaint is sustained in some relevant respect.

Alternatively, at a minimum, USF requests that once discovery commences, it be limited to the named Plaintiffs' claims and not proceed as to others unless a class is certified. Until such time, Plaintiffs have no legitimate interest in other discovery, which would require an enormous expenditure of effort and money.

USF submits that Plaintiffs will never be able to certify a class, so such discovery will be irrelevant and cannot justify the enormous expenditure of time and money. Contract claims, such as those at issue here, are uniquely inappropriate for class action treatment. Plaintiffs simply cannot establish commonality or typicality because different facts concerning material elements of the claim would apply to each putative class member, including the application of differing state laws to different contracts, what was said in the negotiation and execution of the agreements, what plaintiffs knew of the market practices, what plaintiffs knew of USF's practices, from what other food distributors such plaintiffs purchased, the pricing practice of those competitors, the reason for plaintiffs' purchases from USF, the different price lists that plaintiffs used in making a decision on ordering product, whether alternative products were available to the plaintiff and at what costs, and numerous other matters.

Consequently, it is well settled that class action treatment is generally inappropriate for contract claims. See, e.g., Cohn v. Mass. Mut. Life Ins. Co., 189 F.R.D. 209, 215 (D. Conn. 1999) (denying motion for class certification where a breach of contract was claimed); LeTouzel v. Eastman Kodak Co., No. 05-CV-6464T, 2006 WL 1455478, at *2-3 (W.D.N.Y. May 25, 2006) (dismissing at motion to dismiss stage putative class action alleging, inter alia, breach of contract because it would be inappropriate to certify a class where adjudication would "require

the interpretation and application of several different laws of several different states," and putative members were "subject to different terms and conditions."); Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 226 F.R.D. 446, 451-54 (S.D.N.Y. 2005) (in finding that breach of contract claims were not suitable for class certification, the court noted that, even where all members of the class had an identical contract with the defendant to be interpreted under the laws of one jurisdiction, individual issues of (i) whether plaintiffs complied with the contract, (ii) the alleged breach, and (iii) damages predominated over issues common to the putative class); Kaczmarek v. Int'l Bus. Machines Corp., 186 F.R.D. 307, 312 (S.D.N.Y. 1999) (where one of the claims for a class action was for breach of contract, class certification was denied because while breach of contract claims may be similar from state to state, state laws provide different procedural and substantive elements); Mechigian v. Art Capital Corp., 612 F.Supp. 1421, 1432-33 (S.D.N.Y. 1985) (denying class certification of breach of contract claim because of "possibility that different state laws will have to be applied for different members of the proposed class."); Klay v. Humana, Inc., 382 F.3d 1241, 1261 (11th Cir. 2004), cert. denied, 543 U.S. 1081 (2005) (in reversing district court's class certification of a breach of contract claim, the court found that plaintiffs' breach of contract claims were not amenable to class certification because individualized issues of fact will likely predominate). Such conclusion is particularly true under the Second Circuit's latest case addressing class certification, which makes certification even more difficult. See In re Initial Pub. Offering Sec. Litig., No. 05-3343, --- F.3d ---, 2006 WL 3499937 (2d Cir. Dec. 5, 2006).

As the PMC court explained:

> Like other courts, and perhaps Congress, this Court is legitimately concerned about the misuse of civil RICO and the increasingly familiar phenomenon of expanding a straightforward breach of contract into a claim of promissory fraud. A plaintiff then asserts

> two or more mailings in furtherance of promissory fraud and,
> presto, claims a civil RICO violation. Distressingly, this type of
> pleading inflation has become all too common . . . Since civil
> practitioners discovered the RICO statute . . . it seems that the lure
> of transforming a simple, single damage contract claim into a
> treble damage RICO claim has proved irresistible. To sketch what
> is becoming more frequent is to begin to understand the dangers of
> abusing the RICO weapon. Even if one ignores the *in terrorem*
> effect of spurious treble damage suits, the danger of protracted and
> extraordinarily expensive discovery engendered by civil RICO
> claims is all too real.

PMC, 131 F.R.D. at 187.

Courts have limited the scope of pre-class certification discovery to class certification issues in order to judiciously determine whether the class action should be maintained pursuant to Rule 23. See Nat'l Org. for Women, Farmington Valley Chapter v. Sperry Rand Corp., 88 F.R.D. 272, 277 (D. Conn. 1980) (finding that pre-class certification discovery, though sometimes necessary, is subject to judicial limitation. The discovery "must be sufficiently broad in order that the plaintiffs have a realistic opportunity to meet [class certification requirements under Rule 23, but] "the defendant must be protected from discovery which is overly burdensome, irrelevant, or which invades privileged or confidential areas. Discovery is not to be used as a weapon, nor must discovery on the merits be completed precedent to class certification"); Rohrer v. FSI Futures, Inc., No. 94 Civ. 6345, 1997 WL 792955, at *2 (S.D.N.Y. Dec. 23, 1997) (limiting discovery to issues relevant to class certification); see also Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1570-71 (11th Cir. 1992) ("To make early class determination practicable and to best serve the ends of fairness and efficiency, courts may allow classwide discovery on the certification issue and postpone classwide discovery on the merits") (citation omitted). If Plaintiffs' claims do not proceed as a class action based on the

Court's determination at the class certification phase, any classwide merits discovery conducted prior to the class certification determination would be unnecessarily burdensome and expensive.

## CONCLUSION

For the reasons stated above, USF respectfully requests that this Court stay discovery pending disposition of its forthcoming motion to dismiss. Further, USF respectfully requests that once discovery commences, this Court limit the scope of discovery to issues concerning class certification or to the claims of the named Plaintiffs.

Dated: December 29, 2006

Respectfully submitted,

/s/ Glenn M. Kurtz
Glenn M. Kurtz (#ct22471)
Douglas P. Baumstein (#phv01502)
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
Tel.:    (212) 819-8586
Fax:    (212) 354-8113

Admitted *Pro Hac Vice*

Michael P. Shea (#ct19598)
Erick M. Sandler (#ct25029)
Day, Berry & Howard LLP
CityPlace I
Hartford, CT  06103-3499
Tel.:    (860) 275-0100
Fax:    (860) 275-0343
E-mail:  mpshea@dbh.com

Attorneys for U.S. Foodservice, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2006, a copy of the foregoing Memorandum of Law in Support of Defendant U.S. Foodservice, Inc.'s Motion to Stay Discovery Pending Its Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Erick M. Sandler
Erick M. Sandler